(57 Misc. Rep. ·383.)

### MILLER v. CROWN PERFUMERY CO. et al.

(Supreme Court, Special Term, New York County. January, 1908.)

**1. CORPORATIONS—DUTIES OF OFFICERS.**

An officer of a corporation cannot vote to himself the assets of the corporation or take part in any matter affecting his personal interests.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 1393–1398.]

**2. SAME—SALARIES OF OFFICERS.**

The by-laws of a corporation made no provision for payment of salaries to the president and treasurer. Two directors, constituting the majority of the board, who had re-elected themselves president and treasurer, passed a resolution fixing such salaries. *Held* invalid and voidable at the instance of a stockholder.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, § 1340.]

**3. SAME—ACTION BY STOCKHOLDER—MISCONDUCT OF DIRECTORS.**

A stockholder brought an action charging conspiracy on the part of the individual defendants to deprive him of his share of the profits in defendant company, alleging that equal division of the net profits had been made from the formation of the company down to 1906, but at that time two of the defendants combined their votes and elected in plaintiff's stead a third defendant as a director, depriving plaintiff, not only of his office, but of his profits as a stockholder, and that, because of his refusal to sell his stock at their request, they adopted resolutions for payments to·themselves of large salaries, absorbing the surplus profits. The evidence sustained the allegations of the bill, and it was shown that the by-laws made no provision for such salaries, and that there was no agreement that any officer should be compensated for his services. *Held*, that plaintiff was entitled to have the resolutions as to salaries declared void and the directors required to restore to defendant corporation the moneys received by them as salaries since 1906, to be divided among the stockholders according to their respective interests.

Action by Henry D. Miller against the Crown Perfumery Company and others for conspiracy to deprive plaintiff from participating in the profits of defendant company. Decree for plaintiff.

Frederick W. Garvin (George C. Lay, of counsel), for plaintiff.

Frayer, Stotesbury & Gregg (Eugene Frayer, of counsel), for defendants.

LEVENTRITT, J. Charging a conspiracy on the part of the individual defendants to deprive him of participation in the profits of the defendant company, the plaintiff brings this action, basing his right to equitable intervention and relief upon allegations that he and the individual defendants were entitled to an equal division of the net profits realized from the business of that company; that such a division had been made from the inception and formation of the company in 1900 down to and including the year 1905, but that the defendants Batcheller and Russell, in January, 1906, combined their votes to defeat the plaintiff's re-election, and elected in his stead the defendant Welch as an officer and director, aiming thereby to deprive the plaintiff, not only of his office, but of all emoluments and profits as a stockholder; that, with the intention of preventing the plaintiff from deriving any profit from his investment because of his refusal to comply with their request

to sell his stock, they threatened to, and did, adopt resolutions providing for the payment to themselves of large salaries designed to absorb the surplus profits. The plaintiff asks (1) that those resolutions be set aside and declared void; (2) that the individual defendants account for and return to the corporation any moneys received by them thereunder; (3) that an accounting be had of the affairs of the company; and (4) that a dividend be ordered out of the surplus profits.

In order to arrive at an intelligent conclusion it is necessary to refer to the facts, outlining the relations existing between the parties from the beginning, and to detail the circumstances leading up to the commission of the acts upon which the plaintiff founds his right to call the individual defendants to account. In 1865 the defendant Batcheller became a member of the firm of Thompson, Langdon & Co. In 1878 Thompson retired and the business was thereafter conducted by Batcheller, and others with whom he associated himself, until January, 1899, when he became the sole owner. In April Batcheller, retaining the ownership of the assets and good will, admitted into partnership the plaintiff and the defendant Russell, giving to each a 10 per cent. interest in the profits. Later on they formed the corporation of George C. Batcheller & Co., and their respective interests were represented by stock holdings. They then organized the Crown Corset Company as a subsidiary corporation, and elected as its officers the defendant Batcheller president, the defendant Russell treasurer, and the plaintiff secretary. During a series of years prior to 1899 Thompson had been conducting the Crown Perfumery Company of London, with a branch located in this city. During the last six months of that year the George C. Batcheller Company, composed of the individual parties to this action, acted as his selling agents, and then, as the result of negotiations initiated by Thompson, and in which the plaintiff took an important part, Thompson sold to them the American business and assets of the Crown Perfumery Company of London. That sale carried with it a license to use the trade-marks theretofore employed by Thompson, and the agreed consideration therefor was a royalty of 25 per cent. of the future net profits of the business. In January, 1900, the defendant Crown Perfumery Company was formed, with a capitalization of $6,-000, represented by 60 shares of stock of the par value of $100 each. The plaintiff and the individual defendants each subscribed $166.67, and then assigned to the company their rights under the contract with Thompson for the remaining $5,000 of capital stock. The plaintiff and the individual defendants each became the owner of 20 shares of this stock. They were chosen directors, and, as such, elected the following officers: The defendant Batcheller president, the defendant Russell vice president and treasurer, and the plaintiff secretary.

The by-laws defined the duties of the various officers, but made no provision for salaries. Nevertheless so-called salaries for the officers were fixed by resolution of the directors, at an arbitrary sum—in the first instance $5,000, with the understanding that, if the profits did not warrant the payment thereof, they would be proportionately reduced to such an amount as the profits would satisfy. In other words, for some undisclosed reason, the net profits, which were to be divided

equally between them, were termed salaries. They treated "salaries" and "net profits" as synonymous terms. The business of the Crown Perfumery Company was conducted under the management of the defendant Welch. During 18 months the plaintiff supervised that work, and then he took charge of the plant of the George C. Batcheller Company in Connecticut. The defendant Batcheller gave but small portions of his time and attention at irregular intervals to the affairs of the Crown Perfumery Company, and the defendant Russell simply had supervision of the bookkeeping and attended to the financial part of the business. The relations existing between the parties were those of persons engaged in a joint enterprise for their joint and equal benefit and profit, irrespective of the fact that any one did more or less work than the others, or of comparative individual instrumentality in making the venture a success. The company was in the nature of an experiment. The time devoted to it was merely what could consistently be taken away from the other and main business enterprises in which all were interested, and whatever resulted in benefit was equally divided. So that it mattered little what any one of the parties did. Each performed service for all, and all for each. It was understood that each should have an equal interest, not to be diminished by any charge not common to all. This is emphasized by the fact that, after the plaintiff went to Connecticut, he rendered no service to the defendant company, and yet he received an equal share of the profits with the defendants Batcheller and Russell. That understanding between the parties is further shown by an agreement with Thompson that his commissions or royalties were to be deducted before any division was made between the plaintiff and the individual defendants. So that the arrangement resulted in a division of the net profits into four equal parts, one of which was paid to Thompson and the remaining three to the plaintiff, Batcheller, and Russell, respectively. The only distributions made between the plaintiff and those defendants were of net profits. The so-called salaries were designed and so graded as to absorb the net profits. The extent of participation in the company was measured solely by such profits. Their character as net profits was not changed by the action of the parties in substituting another designation for the shares to which they ultimately became entitled. It is significant to note that these shares, representing so-called salaries, were not paid, but were credited to their several drawing or loan accounts.

In 1905 the plaintiff was superseded as superintendent of the Connecticut factory of the George C. Batcheller Company and was not reelected as a director or an officer thereof. During that year negotiations were carried on between the plaintiff and the defendants Batcheller and Russell, looking to the sale or disposition of the plaintiff's holdings in the Crown Perfumery Company, Crown Corset Company, and George C. Batcheller Company, which resulted in a written proposal from the plaintiff, in effect, that he would part with his stock interests in those companies for $17,000, provided he was permitted an examination of the books of the George C. Batcheller Company, or for $25,000 with a waiver of such examination. Thereafter the relations between the plaintiff and the defendant Batcheller became strained to such a

degree that, on December 8, 1905, the plaintiff was notified of his discharge from the employ of the Batcheller Company, to take effect February 1, 1906. The record discloses ample justification for this action. The plaintiff testified that, in December, 1905, he had a conversation with the defendant Russell in which the latter—

"stated that Mr. Batcheller was very angry with me. I asked him why. He said: 'Because you would not sell your stock in the Crown Corset Company to Mr. Batcheller.' I said: 'Mr. Batcheller and I have had a talk about this matter, and everything is perfectly satisfactory.' He said: 'Well, you are making a big mistake if you don't sell that stock to Mr. George C. Batcheller. In our next meeting, which is in February next, we are going to vote ourselves salaries, and your stock won't be worth a damn.' I said to Mr. Russell that Mr. Batcheller has not sent that message to me. He said: 'Yes; he did.' * * * I said to Mr. Russell: 'Mr. Russell, you would not combine with Mr. Batcheller to do that'—after he had made the threat of voting themselves salaries and making my stock worthless. He said: 'Yes; I would.' I said: 'I would not do it to you.' He said: 'I have got to do it, because Mr. Batcheller could do the same thing to me.'"

The plaintiff further testified that he repeated this conversation to the defendant Batcheller, and that the latter replied: "Why, yes; * * * that is about what we are thinking of doing." The defendant Batcheller denied that the threats alleged to have been made by Russell resulted from any direction or intimation on his part, and gave a contrary version of his interview with Miller. The defendant Russell testified that he had been commissioned by Batcheller to see the plaintiff and endeavor to persuade him to sell his holdings in the Crown Corset Company; that in connection with that matter he "suggested to Mr. Miller as my own idea that he should offer to sell Mr. Batcheller also his interest in the Crown Perfumery Company," and that by this means the plaintiff would be able to satisfy a certain indebtedness to Batcheller; that—

"Mr. Miller did not seem to take kindly to my suggestion, and when I pointed out to him the fact that I thought it was good policy for him to do this, to secure the money and get out of these companies, because, I said, 'you must realize that it is in Mr. Batcheller's power, if he so willed, to see that you are not elected either an officer of the Crown Perfumery Company or the Crown Corset Company, and in that event, of course, you would have no salary from either of them.' Mr. Miller said: 'If Mr. Batcheller should suggest such a thing, what would you do?' I said: 'I should vote the same way as Mr. Batcheller, because I have protested, as you know, for some years about your receiving a salary from the Crown Corset Company, and for the last two or three years you have given absolutely no services to the Crown Perfumery Company.'"

Later on he admitted that the substance of his suggestion was that the plaintiff should sell his Crown Perfumery Company stock to Batcheller for $166.67.

On January 26, 1906, the annual stockholders' meeting of the Crown Perfumery Company was held. That meeting was attended by the defendant Batcheller, holding 19 shares; the defendant Russell, 18; one Seaman, 1 share, and the plaintiff, 20 shares. Two shares acquired by the defendant Welch from Russell were not represented. On motion, the by-laws of the company were suspended, in so far as they provided that the secretary of the company should act as secretary at all meetings, and the defendant Russell was chosen to act pro tem., not-

withstanding the presence of the plaintiff, who insisted upon perform-
ing the duties of his office. The individual defendants were elected
directors for the year 1906; the defendant Welch being chosen in place
of the plaintiff. The result of the poll announced was: Batcheller, 58
votes; Russell, 58; Welch, 38; plaintiff, 20. The plaintiff then of-
fered a resolution that the division of future profits of the company be
made in the form of cash dividends. That resolution was tabled.

Soon after the adjournment of the stockholders' meeting the first
meeting of the new board of directors was held by Batcheller and Rus-
sell in the absence of Welch. They re-elected themselves president and
treasurer, respectively, and elected Welch secretary to succeed the
plaintiff. The minutes of the meeting disclose that:

"On motion the following salaries were fixed for the year 1906: Geo. C.
Batcheller, president, $3,600; Edw. W. Russell, vice president and treasurer,
$3,600."

In October, 1906, their attention having been called to the fact that
this resolution was irregular and voidable, the directors met, and the
following proceedings were had:

"The treasurer reported that the gross profits of the business for the six
months ending June 30, 1906, were only $2,850, after paying amount agreed
upon as license to Mr. W. S. Thompson, while the salaries of the officers of
the company for the same period amounted to $3,600. He further reported
that he had paid to the officers the $2,850 on account of their salaries, and
asked instructions of the board as to the balance. Mr. Welch then offered
the following resolution:

"Resolved, that as the gross profits of the business of the company for the
first six months of 1906 were insufficient to pay the salaries voted to the
officers for the same period, that the resolution fixing such salaries and passed
at the meeting of the board of directors held January 26, 1906, be reconsider-
ed, and the following resolution substituted in its place:

"Resolved, that the president, Mr. Batcheller, be paid a salary of $2,500
for the year 1906.

"Resolved, that the vice president and treasurer, Mr. Russell, be paid a
salary of $2,500 for the year 1906.

"The resolution reconsidering resolution passed January 26, 1906, being duly
seconded, was then put and unanimously passed. Upon Mr. Batcheller retir-
ing from the meeting the resolution fixing the salary of the president was
duly seconded and unanimously carried. Messrs. Russell and Welch voted
affirmatively. Mr. Batcheller having resumed the chair and Mr. Russell hav-
ing retired from the meeting, the resolution fixing the salary of the vice presi-
dent and treasurer was duly seconded, and upon being put to a vote was unan-
imously carried: Messrs Batcheller and Welch voting aye."

This resolution was prompted by advice of counsel, following a
demand made by the plaintiff that the original resolution be rescinded
and that the moneys paid in the guise of salaries be restored to the
company. On January 2, 1907, after the commencement of this action,
the directors of the defendant company met. The treasurer reported
a net profit for 1906 of $1,360 and a dividend of 10 per cent. on the
capital stock of the company was declared. That net profit remained
after paying to the president and treasurer $5,000, as provided by the
resolutions of January 26 and October 26, 1906. The plaintiff's share
of this dividend amounted to $200.

In striking contrast are the amounts which the plaintiff received
from the profits during preceding and not more prosperous years.

In 1900 the net profits were $7,107.80, of which the plaintiff received $1,776.95; in 1901 they amounted to $4,430.60, and he received $1,107.65; in 1902, after a loss exceeding $3,000 during the first six months, the business netted $1,352.64, of which his share was $338.17; in 1903 the net profits were $4,000, of which he received $1,000; in 1904 they were $3,000, and he received $750; in 1905 these profits amounted to $6,172.60, his share being $1,543.15. In 1906 the net profits were $8,480. After deducting Thompson's one-fourth, $6,360 remained for distribution. From that amount, however, there was deducted $5,000 for the president and treasurer, leaving but $1,360 for the stockholders. Six hundred dollars went to the payment of the 10 per cent. dividends, and $760 was retained in the treasury of the corporation to meet emergencies.

The first question presented raises the validity of the resolution of January 26, 1906. There is no escape from the conclusion that this resolution was invalid, and that it was voidable either at the instance of a stockholder or of a court of equity. This principle flows logically from the fiduciary relation which exists between an officer of a corporation and the corporation, which prohibits such officer from voting to himself the property or assets of the corporation, or from taking part in any matter affecting his personal interests. Jacobson v. Brooklyn Lumber Co., 184 N. Y. 152, 76 N. E. 1075. Any resolution passed at a meeting at which a director having a personal interest in the matter voted is voidable, without regard to its fairness, certainly when, as here, the vote of that director was necessary to the result. The defendants Batcheller and Russell, meeting as a majority of the board of directors, passed the resolutions in which they were interested, voting to themselves the property of the corporation as salaries. They thereby dealt with themselves as trustees in respect of their trusts for their individual advantage and benefit. Such action has very properly been made the subject of judicial investigation and criticism, and the court will not permit an officer to trifle with the trust which his fiduciary relation imposes upon him, nor to use his position for personal gain to the detriment of the corporation. Corporate stability rests upon official honesty, and the principles enunciated compel a course of conduct which will guarantee such stability. Hiscock v. Lacy, 9 Misc. Rep. 578, 30 N. Y. Supp. 860; Jacobson v. Brooklyn Lumber Co., supra; Beers v. New York Life Ins. Co., 66 Hun, 75, 20 N. Y. Supp. 788; Duncomb v. New York, H. & N. R. R. Co., 84 N. Y. 190; Butts v. Wood, 37 N. Y. 317; Barnes v. Brown, 80 N. Y. 527.

But the individual defendants, recognizing the invalidity of the original resolution, contend that the one of October, 1906, was neither invalid nor voidable; that it was effective to ratify so much of the original resolution as provided for a salary; that it recognized services performed and to be performed, and properly fixed the yearly compensation of the officers mentioned. Standing alone, the October resolution would be invalid, in so far as it provided for payment of back salaries. Metropolitan El. R. Co. v. Kneeland, 120 N. Y. 134, 24 N. E. 381, 8 L. R. A. 253, 17 Am. St. Rep. 619. Its effect as a ratification of the January resolution remains to be considered.

The position taken by the defendants is that by the original resolution they signified their intention to demand compensation for their services and not to serve gratuitously, and that, therefore, the resolution of October legally provided for the amount of such compensation. The difficulty with that position, however, is that the invalidity of the January resolution destroys its effectiveness for all purposes. No part of it was or could have been revived, ratified, or validated by a subsequent resolution of the directors. The claim of the defendants for salary prior to the passing of the October resolution stands unsupported by any authoritative action on the part of the company before the rendition of the services, and is reduced to a mere claim for back salary for services gratuitously performed, which could not legally be voted to them. Blair v. Telegram Newspaper Co., 172 Mass. 201, 51 N. E. 1080; Metropolitan E. R. Co. v. Kneeland, supra. An unexpressed intention of an officer of a corporation to demand compensation is of no avail. The manner in which these defendants claim that they expressed an intention to charge for their services does not justify the presumption of an implied promise to pay therefor. If such an intention was expressed, it must necessarily have been by the defendants as officers to themselves alone as directors. The only evidence of such an intention is found in the inference to be drawn from the January resolution, which is ineffective because of its invalidity, and which cannot be invoked to perpetuate an intention communicated under the circumstances disclosed.

The defendants cite National Loan & Investment Co. v. Rockland Co., 94 Fed. 335, 36 C. C. A. 370. But the facts in that case are not analogous. A quotation from the opinion will suffice to show the distinction. At page 339 of 94 Fed., page 375 of 36 C. C. A., the court, by Sanborn, C. J., say:

"The stockholders expressly empowered the board of directors to fix the salaries of all the officers of the corporation. This by-law itself raises a strong presumption that the owners of the corporation intended to pay its officers for their services. The board of directors could not fix the salaries of officers, if no salaries were to be paid. When to this by-law is added the express finding of the referee that it was understood and agreed at the inception of the business of the corporation between all its incorporators and Jenkins, who was chosen president, that he should receive reasonable compensation for his services in that office, and the further fact that he served under this by-law and agreement and his salary was fixed and allowed without objection thereunder, the conclusion is irresistible that his right to compensation rests upon a valid implied contract between him and all the parties interested in the corporation, made before his services were rendered. The acts of the board in fixing the amount of his salary were expressly authorized by the by-laws, and were naught but the performance of the prior agreement by which the corporation was bound."

That is not this case. The by-laws of the defendant company made no provision for the payment of salaries. The board of directors was not empowered to fix salaries. There was no agreement or understanding at the inception of the business of the corporation that any officer should be compensated for services performed. There are no facts disclosed from which an agreement to pay salaries could be implied.

The cited case of Bassett v. Fairchild, 132 Cal. 637, 64 Pac. 1082, 52 L. R. A. 611, is likewise inapplicable. There the vice president performed services as a general manager of the corporation in addition to his official duties prescribed by the by-laws. The court held that under the circumstances he could not reasonably be expected to perform the services characterized by it as "numerous and onerous" without compensation, and that there was no presumption that such services were gratuitously performed. Here, however, there is no claim or intimation that the defendants Batcheller and Russell ever performed any services other than the duties which as defined by the by-laws were required of them in connection with their respective offices. Therefore the moneys paid to the defendants Batcheller and Russell as for their services, between January and October 26, 1906, were so paid without valid authority. These payments were not ratified or validated by the October resolution, and to that extent, at least, the relief here sought must be granted.

It is a serious question whether the October resolution was valid as to salaries for the remainder of the year. It was not an independent action on the part of the board of directors, but by its terms was merely supplemental to the January resolution, and so phrased as to be practically incapable of division. However, it is unnecessary to consider that question, in view of the conclusion at which I have arrived that the defendants Batcheller and Russell are entitled to no compensation because of their attempt to absorb the profits of the defendant company in salaries payable to themselves, with the intention of thereby depriving the plaintiff of any participation therein. Up to January, 1906, no salaries had been provided for or paid to any officer of the defendant company, and the only distribution of profits was by equal division between the plaintiff and the defendants Batcheller and Russell. The defendant Russell testified that the term "salary," applied to the shares received by the parties, was adopted as a mere "matter of form." He testified that a salary of $5,000 was voted to each of the officers for the first year, based on statements made by Thompson that the profits of the business would far exceed the amount thus provided for. It is inconceivable that the parties could have been misled by any representations of Thompson, when they had acted as his sole selling agents during the six months immediately preceding their purchase of the business, and must necessarily have been thoroughly familiar with all the details and with the results of the enterprise. I am unable to find a single fact indicative of an intention to pay or to receive salaries. As a general rule salaries are fixed at a definite amount. Here the so-called salaries were not fixed, but were indeterminate; their amount being dependent upon and so regulated as to absorb the net profits of the business. Salaries are paid; while here shares in profits were merely credited to the respective loan accounts of the parties. Salaries are given for services performed and are measured by the extent of those services; here profits were divided into equal shares, despite the fact that the parties did not render equal service. An agreement to pay salary creates an obligation enforceable against the corporation; here no liability attached to the defendant company, as the parties were entitled to receive equal

shares of the net profits. Under no possible theory or definition can it be said that any salaries were paid to those parties prior to 1906.

The bitter feeling which resulted from the differences between the plaintiff and the defendant Batcheller, and the consequent estrangement, led to the attempt to induce the plaintiff to part with his holdings in the defendant company. The defendant Russell approached the plaintiff with the proposition to sell his stock in the Crown Perfumery Company to Batcheller for $166.67, notwithstanding that large dividends had been received on the stock in previous years and the fact that at that very time a dividend far in excess of the amount offered was about to be declared thereon. Russell testified that he advised the plaintiff to sell "because, I said, 'you must realize that' it is in Mr. Batcheller's power, if he so willed, to see that you are not elected * * * an officer of the Crown Perfumery Company, and in that event, of course, you would have no salary from either of them.' * * * I said I should vote the same way as Mr. Batcheller. * * * "

Whether we accept the plaintiff's story that there was a direct threat to strip his stock of its dividend-earning power, or that of Russell that the continuance of the plaintiff's salary depended upon his willingness to sell his stock to Batcheller, the practice which up to that time had prevailed of using the terms "profits" and "salaries" interchangeably naturally led the plaintiff to understand that, unless he complied, the future salaries of Batcheller and Russell would consume his dividends. His understanding is evidenced by the resolution offered by him at the annual meeting in the month next succeeding his interview with Russell, whereby he sought to bind the company to a division of its profits by dividends and the exclusion of salaries.

The plaintiff's refusal to sell brought matters to a crisis, and he was deposed as an officer of the company. Then Batcheller and Russell, comprising a majority of the board of directors, met and voted to themselves equal salaries, amounting to $7,200 for the year 1906, although the profits divided between the parties in 1905 were but $4,629.45, and although they had never equaled the amount voted. And, when their attention was called to the irregularity of the resolution and to the unreasonableness of the amount provided for, the defendants Batcheller and Russell, not in the interests of the corporation, but still seeking to further their own personal interests at the expense of the company's property and assets, called a meeting of the board and attempted to ratify the invalid resolution, and to provide, by one designed to be retroactive, to grade their salaries so as to absorb substantially all of the profits, leaving but a mere pittance for dividends. They were aroused by plaintiff's demand to seek legal advice, not with a view to shielding the company, but, if possible, to remedy an oversight which might defeat their claim to salaries. Such acts are consistent with no other conclusion than that these defendants intended in the first instance to absorb all the profits in order to deprive the plaintiff of any participation therein, and, when they discovered that this could not legally be accomplished, they sought to gauge the amount of their salaries so as to consume the bulk of the profits and leave little or nothing to be divided with the plaintiff.

The enmity of these defendants toward the plaintiff as an individual caused them to lose sight of the duty they owed him as a stockholder, as well as the duty they owed the corporation to protect its assets and its property against unusual loss and unnecessary waste, and to manage its affairs, not for personal gain or advantage, but for the benefit of the corporation and its stockholders. They were not actuated by good faith and unselfishness, but by a desire to take to themselves all benefit that the business realized, in order that the plaintiff would receive no dividends on its stock. They may have been justified in not re-electing the plaintiff as an officer; but there is no justification for their efforts to punish him for refusing to sell his stock by rendering it unproductive, and at the same time securing and reserving to themselves all the advantages, benefits, and profits of the corporation. Even if these defendants were not guilty of intentional fraud toward the plaintiff, their conduct had the same effect and calls for the same relief.

A corporation is but a legislative fiction. It is incapable of managing its own affairs, or of acting for itself. Therefore the law places its management under the control of directors, who become the brains of the corporation. All of its property and assets the corporation holds in trust for creditors and stockholders, the directors being its agents and trustees to carry out the objects and to perform the duties of the trust, and they must assume the responsibility of actual trustees. Their actions are closely scrutinized by courts of equity, which acquire jurisdiction through a general power to supervise trusts and to call trustees to account for any breach of trust. In giving first birth, and then life, to corporations, the law aims at two objectives: (1) To strengthen the corporation and make the enterprise a safe one for investment, and (2) to induce investment by permitting dividends from surplus profits. Provisions of law are so molded as to attain those objects. When the directors, by adhering to those provisions and following the legal principles enunciated for their guidance, have brought the corporation to such a condition of strength that any one may safely deal with it, the first object has been accomplished, and the law then authorizes the second.

The duties of directors are threefold: (1) To the corporation; (2) to the public; and (3) to the stockholders. To the corporation their relation is fiduciary, and they are required to act at all times unselfishly and in good faith. To the public they owe the duty of absolute obedience to the law, which defines their rules of action. To the performance of this duty they are strictly held, and even good faith will not avail as an excuse for a violation of the statute. To the stockholders they stand in the position of acting trustees, and are required to exercise good faith and honest judgment, so that the interests of the stockholders may be protected and promoted. Equity will condemn bad faith, whether exercised from malicious motives or to advance individual interests. So long as good faith is exercised, the stockholders cannot complain, and the court will not interfere. But, when directors permit feelings of malice or a desire to promote their personal ends to warp their honest judgment and to influence them to perform acts which violate rights of stockholders, the court should be zealous to find a remedy and to compel redress.

109 N.Y.S.—49

These defendants were not actuated by good faith when they fixed salaries for themselves with an intention to absorb all of the profits, and when they were warned of their invalid action they were not prompted by their duty to the corporation or to the plaintiff as a stockholder when they gauged their salaries so as to consume substantially all the profits. Their declaration of a dividend, while designed to indicate the existence of good faith and honest judgment, was in reality merely a pretext to conceal bad faith. Such actions as are here disclosed have been repeatedly condemned. Hiscock v. Lacy, supra; Jacobson v. Brooklyn Lumber Co., supra; Fougeray v. Cord, 50 N. J. Eq. 185, 24 Atl. 499. "Directors are not required to be wise, but they are required to be honest."

The defendants Batcheller and Russell will be directed to account for and restore to the defendant corporation all moneys received by them as salaries since January 1, 1906, to be distributed among the stockholders, including the plaintiff, according to their respective interests.

Decreed accordingly.